Cynthia WALTERS, Individually and as parent and natural guardian of Michael Danielle Walters, a minor

v.

CITY OF ALLENTOWN and Jeanne Costello.

No. 92–5911.

United States District Court, E.D. Pennsylvania.

April 22, 1993.

Richard J. Orloski, Allentown, PA, for plaintiff.

Kathryn Wohlsen Mayer, Allentown PA, for defendant City of Allentown.

Robert J. Magee, Allentown, PA, for defendant Costello.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

### INTRODUCTION

This is a declaratory judgment action seeking a declaration of the rights of the plaintiff, Michael Danielle Walters, under a pension plan established by the defendant, City of Allentown. We have before us a Motion for Summary Judgment filed by both defendants on March 10, 1993 and a Cross–Motion for Summary Judgment filed by plaintiff on March 22, 1993.

### FACTUAL BACKGROUND

As conceded on page 1 of plaintiff's Brief and on pages 6 and 10 of defendants' Brief, the facts necessary to resolve this matter are not disputed. In an abundance of caution, whenever possible, we will summarize facts as they are set forth in plaintiff's brief. The plaintiff, Cynthia Walters, is the mother of a minor child named Michael Danielle Walters who was born on January 25, 1988. As acknowledged in a written Paternity Agreement [1], dated October 18, 1988, the father of this child was one Michael Daniel Costello. In 1988, Michael Daniel Costello was a police officer for the City of Allentown. Officer Costello died of a heart attack on March 6, 1992 and was survived by his wife, defendant Jeanne Costello. On or about July 17, 1992, plaintiff requested benefits under the City of Allentown Police Pension Fund, but was denied the benefits because Officer Costello was survived by a wife who was entitled to the benefits. The denial was based upon Section 143.20 of the Codified Ordinances of the City of Allentown which provides:

**143.20 BENEFITS FOR SURVIVING SPOUSE OR DEPENDENT CHILDREN**

A. Death in the Line of Duty

If any police officer while in the actual performance of his or her duty is killed or so injured that he or she dies from the effects thereof, his or her surviving spouse shall be entitled to receive a pension equivalent to one-half (½) the salary received by the officer at the time of death, and any service increment the officer may have been entitled to at the time of death. (12580 § 1 12/7/83)

In case there is no surviving spouse, or after the death of the surviving spouse, or in case of her or his remarriage, the pension and service increment shall be paid to the guardian of the deceased officer's dependent children, if any, without abatement until the youngest child reaches the age of eighteen (18) years, after which all pension and service increment rights shall cease, with the exception that after the last child has reached the age of eighteen (18) years, then the surviving spouse who has since remarried, at this time will once again have his or her pension rights as a

---

1. A copy of this agreement is attached to defendants' motion as Exhibit "A" to the sworn interrogatories on file. An unsworn copy of this agreement is also attached to plaintiff's motion as Exhibit "C". The brief agreement obligates Michael D. Costello to pay $30 per week support along with medical bills. No express mention is made of any duty pertaining to death or pensions.

surviving spouse reinstated for the remainder of his or her life. (12580 § 1 12/7/83) No surviving spouse who has for one (1) year or upwards previous to the death of the police officer, wilfully or maliciously deserted the police officer shall have the right to claim any pension or service increment under the provision of this Article. (12580 § 1 12/7/83)

Allentown, Pa., Code § 143.20. Had Officer Costello not been survived by a wife, plaintiff's minor child, Michael Danielle Walters, would have shared in the pension fund regardless of her status as being born out of wedlock. Affidavit of Mayor Daddona, President of the Pension Fund, attached to defendants' Brief.

### STANDARD OF REVIEW

■ Fed.R.Civ.P. 56(c) instructs a court to enter summary judgment when the record reveals that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." This rule provides the court with a useful tool when the critical facts are undisputed, facilitating the resolution of a pending controversy without the expense and delay of conducting a trial made unnecessary by the absence of factual dispute. *Peterson v. Lehigh Valley Dist. Council,* 676 F.2d 81, 84 (3d Cir.1982); *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Summary judgment is inappropriate, however, where the evidence before the court reveals a genuine factual disagreement requiring submission to a jury. An issue is "genuine" only if the evidence is such that a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* at

249, 106 S.Ct. at 2511. However, if the evidence is merely "colorable" or is "not significantly probative," summary judgment may be granted. *Id.*

■ In a summary judgment action, the moving party bears the initial burden of identifying for the court those portions of the record which it believes demonstrate the absence of a material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). This burden may be discharged by demonstrating that there is an absence of evidence to support the non-moving party's case. *Id.* at 325, 106 S.Ct. at 2554. Following such a showing in a case where the non-moving party is the plaintiff and therefore bears the burden of proof, it must by affidavits or by the depositions and admissions on file "make a showing sufficient to establish the existence of [every] element essential to that party's case." *Id.* at 322, 106 S.Ct. at 2552; *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Fed.R.Civ.P. 56(e). In making its ruling on a summary judgment motion, the court must view all inferences in a light most favorable to the non-moving party, *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Continental Ins. Co. v. Bodie,* 682 F.2d 436, 438 (3d Cir.1982), must resolve all doubts against the moving party, *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985), and must take as true all allegations of the non-moving party that conflict with those of the movant, *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

### DISCUSSION

The plaintiff claims that the Allentown, Pa., Code § 143.20 discriminates against her in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution,[2] because her daughter Michael Danielle Walters was born out of wedlock.

---

2. **AMENDMENT XIV—**
    **Section 1.** All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. U.S. Const. amend. XIV, § 1.

Plaintiff's complaint does not articulate the exact manner in which the pension plan discriminates against her, but in her Brief, she objects to the effect of the Ordinance in directing all benefits to the defendant spouse who has no duty to support the plaintiff's child.[3]

The plaintiff directly cites four cases to support her position. *Levy v. Louisiana,* 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968), which held that children born out of wedlock could bring an action under a Louisiana statute for the wrongful death of their mother; *Glona v. American Guarantee & Liability Ins. Co.,* 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968), which held that a mother in Louisiana could recover for the wrongful death of a child born out of wedlock; *Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972), which held that a Louisiana workmen's compensation statute that relegated unacknowledged children born out of wedlock to a lesser status was unconstitutional; and *Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), which held that a plaintiff had failed to prove that racially discriminatory intent or purpose was a motivating factor in a rezoning decision.

The cases cited by plaintiff form but a small part of the many decisions relating to children born out of wedlock. To help provide historical perspective, we shall examine the cases following the first two cases relied upon by plaintiff. *Labine v. Vincent,* 401 U.S. 532, 91 S.Ct. 1017, 28 L.Ed.2d 288 (1971), dealt with a constitutional challenge to Louisiana statutes that expressly precluded children born out of wedlock from claiming the same intestate rights as other children. The Court upheld the statutes and stated "*Levy* did not say and cannot fairly be read to say that a state can never treat an illegitimate child differently from legitimate offspring." *Id.* 401 U.S. at 536, 91 S.Ct. at 1019. The Court went on to state:

> The social difference between a wife and a concubine is analogous to the difference between a legitimate and an illegitimate child. One set of relationships is socially sanctioned, legally recognized, and gives rise to various rights and duties. The other set of relationships is illicit and beyond the recognition of the law.... [T]he power to make rules to establish, protect, and strengthen family life as well as to regulate the disposition of property left in Louisiana by a man dying there is committed by the Constitution of the United States and the people of Louisiana to the legislature of that State. Absent a specific constitutional guarantee, it is for that legislature, not the life-tenured judges of this Court....

*Id.* at 538, 91 S.Ct. at 1021.

*Labine* was followed by *Weber,* the third case cited to support the plaintiff's position. Following *Weber,* the Court decided *Gomez v. Perez,* 409 U.S. 535, 93 S.Ct. 872, 35 L.Ed.2d 56 (1973), which held that a Texas common law rule which denied support to children born out of wedlock violated the Equal Protection Clause of the U.S. Constitution. That same year the Court invalidated as unconstitutional a New Jersey law limiting assistance payments for the poor to families in which the adults were married. The Court found that the practical effect of the law operated almost invariably to deny benefits to illegitimate children while granting benefits to children who are legitimate. *New Jersey Welfare Rights Org. v. Cahill,* 411 U.S. 619, 93 S.Ct. 1700, 36 L.Ed.2d 543 (1973). The following year the Court decided *Jimenez v. Weinberger,* 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974) and found unconstitutional a social security[4] provision

---

**3.** Pennsylvania gives a court the right to attach a municipal pension to provide child support. 23 Pa.C.S.A. § 4348(N). Nevertheless, the support law appears to assume the existence of a living person who is obligated to provide support. See for instance, 23 Pa.C.S.A. § 4321(2). *See also Wolfsohn v. Solms,* 392 Pa. 129, 139 A.2d 523 (1958) (duty to support wife ends with death);

*Homich's Estate,* 9 Pa. D & C 327 (Berks County 1926) (duty to support minor ends with death).

**4.** *See also Beaty v. Weinberger,* 478 F.2d 300 (5th Cir.1973), *aff'd mem.,* 418 U.S. 901, 94 S.Ct. 3190, 41 L.Ed.2d 1150 (1974); *Griffin v. Richardson,* 346 F.Supp. 1226 (D.Md.), *aff'd mem.,* 409 U.S. 1069, 93 S.Ct. 689, 34 L.Ed.2d 660 (1972); *Davis v. Richardson,* 342 F.Supp. 588

which provided that certain children born out of wedlock could only obtain benefits if they lived with or received support from a disabled wage earner.

*Jimenez* was followed by the decision in *Mathews v. Lucas,* 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976), which upheld the validity of a statutory presumption of dependency for legitimate children of deceased recipients of social security benefits. The Court reaffirmed its holding in *Labine,* stating "[w]e are unwilling to assume that discrimination against children [born out of wedlock] in appellee's class in state intestacy laws is constitutionally prohibited." *Id.* 427 U.S. at 517 n. 18, 96 S.Ct. at 2767 n. 18. Nevertheless, to pass constitutional muster, such discrimination must promote recognized state objectives. In *Trimble v. Gordon,* 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977), the Court found a state law unconstitutional because it only permitted children born out of wedlock to inherit from their mothers.[5]

The following year in *Lalli v. Lalli,* 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978), a plurality upheld a New York statute which required a court "filiation" order before a child born out of wedlock could inherit from its father. The plurality stated:

> The primary state goal underlying the challenged aspects of § 4–1.2 [the statute in question] is to provide for the just and orderly disposition of property at death. We long have recognized that this is an area with which the States have an interest of considerable magnitude.

*Id.* at 268, 99 S.Ct. at 524–25 (citing *Trimble,* 430 U.S. at 771, 97 S.Ct. at 1466; *Weber v. Aetna Casualty & Surety Co.,* 406 U.S. at 170, 92 S.Ct. at 1404; *Labine v. Vincent,* 401 U.S. at 538, 91 S.Ct. at 1021).

Two years later in *United States v. Clark,* 445 U.S. 23, 100 S.Ct. 895, 63 L.Ed.2d 171 (1980), the Court was faced with a federal Civil Service Retirement Act requirement which limited an employee's survivors bene-

fits to children "who lived with the employee." The Court read "lived with" to include situations in which a child had lived with an employee in the past to avoid "a serious constitutional question." *Id.* at 33, 100 S.Ct. at 903.

In *Mills v. Habluetzel,* 456 U.S. 91, 102 S.Ct. 1549, 71 L.Ed.2d 770 (1982) and *Pickett v. Brown,* 462 U.S. 1, 103 S.Ct. 2199, 76 L.Ed.2d 372 (1983), the Court struck down one and two year statutes of limitations for paternity actions. Following *Pickett,* in *Clark v. Jeter,* 486 U.S. 456, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988), the Court held that Pennsylvania's six year statute[6] of limitations for paternity actions violated the Equal Protection Clause. The Court found that unlike other children, children born out of wedlock were denied a sufficient opportunity for the assertion of support claims. The analysis of the Court is particularly instructive in light of the sometimes seesaw results in the decisions which preceded *Clark v. Jeter:*

> In considering whether state legislation violates the Equal Protection Clause of the Fourteenth Amendment, U.S. Const., Amdt. 14, § 1, we apply different levels of scrutiny to different types of classifications. At a minimum, a statutory classification must be rationally related to a legitimate governmental purpose. *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973); *cf. Lyng v. International Union, UAW,* 485 U.S. 360, 370, 108 S.Ct. 1184, 1192, 99 L.Ed.2d 380 (1988). Classifications based on race or national origin, *e.g., Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967), and classifications affecting fundamental rights, *e.g., Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 672, 86 S.Ct. 1079, 1084–85, 16 L.Ed.2d 169 (1966), are given the most exacting scrutiny. Between these extremes of rational basis review and strict scrutiny lies a level of intermediate

---

(D.Conn.), *aff'd mem.,* 409 U.S. 1069, 93 S.Ct. 678, 34 L.Ed.2d 659 (1972).

**5.** *See also Reed v. Campbell,* 476 U.S. 852, 106 S.Ct. 2234, 90 L.Ed.2d 858 (1986).

**6.** The old six year statute of limitations was replaced in 1985 by an 18 year statute of limitations which was sought and drafted by this Judge when he was serving on the State Court of Common Pleas. 23 Pa.C.S.A. § 4343(b).

scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy. *See, e.g., Mississippi University for Women v. Hogan,* 458 U.S. 718, 723–724 and n. 9, 102 S.Ct. 3331, 3336 and n. 9, 73 L.Ed.2d 1090 (1982); *Mills v. Habluetzel,* 456 U.S. 91, 99, 102 S.Ct. 1549, 1554–55, 71 L.Ed.2d 770 (1982); *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 456–57, 50 L.Ed.2d 397 (1976); *Mathews v. Lucas,* 427 U.S. 495, 505–506, 96 S.Ct. 2755, 2762–2763, 49 L.Ed.2d 651 (1976). To withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective.

*Clark v. Jeter,* 486 U.S. at 461, 108 S.Ct. at 1914.

■ It is clear that those who assert a violation of equal protection must prove "the existence of purposeful discrimination." *McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987); *Whitus v. Georgia,* 385 U.S. 545, 550, 87 S.Ct. 643, 646, 17 L.Ed.2d 599 (1967); *see also Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 241, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976).

■ On its face, Allentown, Pa., Code § 143.20 does not contain any reference to a child or children born out of wedlock, and only uses the words "dependent children" and "child". These words become relevant only if there is no surviving spouse in which case defendants concede plaintiff's child would be entitled to benefits just as in the case of any other child. Accordingly, we are not dealing with an express provision of an ordinance classifying children[7] but rather, we are dealing solely with the *effect* of an otherwise neutral ordinance. There is, in fact, no direct evidence of purposeful discrimination in this case. Indeed, the sparse evidence before us is to the contrary. See Affidavit of Mayor Daddona, President of the Pension Fund, attached to defendants' Brief (If Officer Costello was not survived by his

spouse, plaintiff's minor child would have shared in the pension fund regardless of the child's illegitimacy.). Furthermore, Pennsylvania considers all children to be legitimate regardless of the marital status of their parents. 23 Pa.C.S.A. § 5102(a). Purposeful discrimination would be inconsistent with this legislation. From a practical standpoint, we can perceive nothing unique about Allentown, Pa., Code § 143.20. It undoubtedly mirrors countless retirement plans throughout the United States, and setting aside this Ordinance might well undermine the actuarial foundations of this and similar plans.

The purpose of Allentown, Pa., Code § 143.20 is to provide funds to support the spouses of deceased police officers. The plaintiff has neither submitted any sworn affidavits, nor pointed to any other appropriate evidence under Fed.R.Civ.P. 56 that would suggest the Ordinance was enacted for a discriminatory purpose, rather than this important governmental objective.

We turn to the last case cited by plaintiff's counsel, *Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), where the Court dealt with an ordinance which allegedly had the *effect* of causing racial discrimination. The Court articulated areas of inquiry which, along with disproportionate impact, might show an intent or purpose to discriminate: a clear pattern of impact unexplainable on grounds other than race; the historical background and events which led to the ordinance or action; departures from normal procedural sequences; departures from usual substantive factors; and the legislative history. *Id.* at 266–268, 97 S.Ct. at 564–565. *Arlington Heights* concerned racial discrimination which required strict scrutiny. In the instant case, intermediate scrutiny is the appropriate legal test, nevertheless, when applied to the present matter, the plaintiff has failed to establish that any of the areas of inquiry specified in *Arlington Heights* show an intent or purpose to discriminate.

---

**7.** Nor is there any evidence to suggest that the Ordinance was applied in a different manner to

different classes of persons.

A moving party may discharge his burden in a summary judgment motion by demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Here, in response to the defendants' showing, the plaintiff has offered no statistical evidence of any type, much less of any pattern or practice. The result in this matter is easily explainable on grounds of a statutory purpose of helping spouses of deceased police officers. There, likewise, is no evidence of the history, legislative or otherwise, which led to the enactment of Allentown, Pa., Code § 143.20 and we have no reason to believe that the motives behind it were improper. The historical events immediately preceding plaintiff's suit are straightforward and unremarkable. The correspondence and actions are polite and untouched by substantive or procedural departures. This case is readily distinguishable from *New Jersey Welfare Rights Org. v. Cahill*, 411 U.S. 619, 93 S.Ct. 1700, 36 L.Ed.2d 543 (1973), where "in practical effect it [the law in question] operated almost invariably to deny benefits to illegitimate children." *Id.* We believe that while there will undoubtedly be situations like the instant case that arise from time to time, they will not be frequent.

Without question, police work can be dangerous. Nevertheless, it seems fair to assume that more older police officers than younger ones will die, and that when they do they will be less likely to have minor children to support. When children do survive an officer, it would also seem fair to assume that those charged with upholding the law will not have more children born out of wedlock than those who are not so charged.[8]

Of far more consequence is the divorce rate produced by the stresses of police work.[9] In such commonplace situations, the ordinance has the equal effect of denying benefits to divorced spouses even though they have children who were born in wedlock. To be sure, this may be remedied by a property settlement agreement or equitable share of a divorce settlement, but this is not a certain result.[10] A putative father can acknowledge paternity and if he refuses, a court can determine parentage. This would give a child born out of wedlock all the rights of any other child.[11] A father is also free to make voluntary provisions for a child born out of wedlock upon his demise. All these variables point more to an infrequent occurrence of the present situation rather than to an invariable occurrence. They also point to a burden imposed by the Ordinance on some children who are not born out of wedlock.

A policeman's lot is often not a happy one. They are far from the highest paid members of society and the money available to fund pension plans is not without limits. In the absence of any proper evidence of discriminatory intent or purpose, we will not quibble with the difficult choices made by those who represent police officers and those who are elected to supervise them. No legislative act can be expected to be perfect or fit every situation.

An appropriate order follows.

### ORDER

AND NOW, this 22nd day of April, 1993, defendants' Motion for Summary Judgment

---

8. Approximately one out of every four U.S. births is to an unmarried woman. See for instance Times Books, N.Y., *The Economist Book of Vital World Statistics* 224 (1990).

9. It is widely accepted that approximately 50% of all U.S. marriages end in divorce. The divorce rate is half the marriage rate. See Times Books, N.Y., *The Economist Book of Vital World Statistics* 224 (1990). Although no individual data base is known to exist, Law Enforcement Psychological Services, Inc. of San Jose, California, estimates the divorce rate for police officers at approximately 75%, as do others in the profession. See direct quotes: Avis Thomas–Lester, *Officers Find Love is Blue; Across Area, More Police Marrying Police*, Washington Post, May 28, 1991, § 1, at A1; see also Wendy Benedetto, *Cops Cope with Bad Rap*, USA Today, August 6, 1991, § News, at 9A; Linda Matchan, *Fighting the Police Taboo of Stress*, Boston Globe, October 30, 1991, § Metro/Region, at 16.

10. Pennsylvania provides for equitable distribution of marital property in an action for divorce. 23 Pa.C.S.A. § 3502.

11. See 23 Pa.C.S.A. § 5103(a) and 20 Pa.C.S.A. § 2107(c).

filed March 10, 1993 is **GRANTED** and plaintiff's Cross–Motion for Summary Judgment filed March 22, 1993 is **DENIED.** In so doing we necessarily determine that, in its present application, Ordinance 143.20 of the City of Allentown, Pennsylvania is not unconstitutional or in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. **JUDGMENT IS ENTERED IN FAVOR OF DEFENDANTS** and **AGAINST PLAINTIFF.** This case is **CLOSED.**