Gloria **PROCTOR**, as mother and next friend of James A. Proctor, Nathaniel Proctor, Michelle L. Proctor, Plaintiff,

v.

**UNITED STATES of America et al., Defendants.**

Civ. A. No. 76–436.

United States District Court, District of Columbia.

Nov. 30, 1977.

---

Julian Karpoff, Washington, D. C., for plaintiff.

Jay S. Bernstein, Silver Spring, Md., John J. Terry, Asst. U. S. Atty., Washington D. C., for defendants.

Before MacKINNON, Circuit Judge, and GREEN and PARKER, District Judges.

MEMORANDUM OPINION

JUNE L. GREEN, District Judge.

At issue in this case is a provision of the Civil Service Retirement Act which conditions award of a survivor's annuity to illegitimate children on a showing that the children have "lived with" the deceased federal employee "in a regular parent-child relationship." Legitimate children do not have to meet this requirement, and the question is whether the difference in eligibility standards violates the equal protection of the laws guaranteed by the Due Process clause of the Fifth Amendment. The Court decides that it does.

I.

Mr. James A. Holloway was employed by the District of Columbia government at the time of his death in late 1974. Under 5 U.S.C. § 8341, a provision of the Civil Service Retirement laws, his survivors had a right to apply for annuity benefits. On January 18, 1975, plaintiff Gloria Proctor filed with the Civil Service Commission an application for annuities on behalf of her three children: James, Nathaniel and Michelle Proctor. The children had not lived with Mr. Holloway, but he had acknowledged them as his own during proceedings brought by plaintiff in 1963 and 1965 for support, and his paternity had been adjudicated by the Juvenile Court for the District of Columbia. Mr. Holloway was under a continuing court order to support plaintiff's children, and the uncontradicted record shows that he made cash contributions and bought groceries for them up to the date of his death.

At about the same time that plaintiff applied for benefits, Mrs. Helen L. Holloway, the deceased's common-law wife, filed with the Commission applications for a spouse's annuity and for a child's annuity on behalf of herself and her daughter. Mrs. Holloway and her daughter were added as defendants in this action because a decision by the Court granting plaintiff's children relief would diminish the amount of the annuity payable to the daughter.

The Commission's Bureau of Retirement, Insurance and Occupational Health denied plaintiff's application for benefits on February 24, 1975. On April 7, 1976, the Commission's Appeals Review Board affirmed the Bureau's ruling. The Board based its decision explicitly on the definition of "child" contained in 5 U.S.C. § 8341(a)(3)(A)(ii), which is used to determine the eligibility of children for survivor's annuities. The pertinent provision reads:

§ 8341. Survivor annuities

(a) For the purposes of this section—

. . . . .

(3) "child" means—

(A) an unmarried child under 18 years of age, including (i) an adopted child, and (ii) a stepchild or recognized natural child who lived with the employee or Member in a regular parent-child relationship.

Plaintiff filed her original complaint in this action on March 17, 1976, and a subsequent request for a three-judge court was granted on March 24, 1977. She seeks an injunction which would bar use of the cohabitation requirement and compel the Commission to place her children on its rolls for receipt of child survivor annuities. She also seeks a lump sum in the amount of retroactive survivor annuity payments allegedly due the children since their father's death.

II.

Two recent Supreme Court decisions, *Jimenez v. Weinberger*, 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974), and *Mathews v. Lucas*, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976), deal with provisions of the Social Security Act containing legislative classifications based on illegitimacy. To a substantial extent these decisions define the issues we confront today.

In *Jimenez* the Court considered a constitutional challenge to a provision of the Act governing the award of benefits to children of disabled wage earners. The government maintained and the Court agreed that the overall purpose of the statutory scheme was

to channel financial support to children actually dependent on the disabled workers and to ferret out undeserving claims. *Jimenez, supra,* 417 U.S. at 634–636, 94 S.Ct. 2496. To serve these purposes the statute defined an eligible "child" in a number of precise ways, the effect of which was to divide potential recipients into categories, supposedly in accord with a legislative judgment as to the likelihood of their members being dependent and thus deserving of benefits. All legitimate children received grants without having to make a particularized showing of dependency. Illegitimate children, however, were divided into a number of classes. Illegitimates born *before* the onset of their parent's disability qualified for benefits if they fell within a number of certain statutory exceptions; all else failing, they had an opportunity to show that they had been living with or receiving support from the worker at the time disability began. Illegitimates born *after* the onset of their parent's disability also qualified for benefits under certain statutory exceptions, but if they did not happen to come under those exceptions, they were given no additional chance to make a factual showing that they were dependent on the worker and thus came within the purposes of the statute. In effect the provision granted a conclusive "presumption" of dependency to all legitimates and those illegitimates covered by certain exceptions, while it imposed an equally rigid presumption of nondependency upon certain afterborn illegitimate children. Plaintiffs in the case belonged to this last group.

The Court emphasized two points. First, it directed what were, in effect, due process objections to the statutory scheme's "blanket and conclusive exclusion of appellants' subclass of illegitimates" from the Social Security Act's benefits. *Supra* at 636, 94 S.Ct. at 2501. "Assuming that the appellants are in fact dependent on the claimant,

it would not serve the purposes of the Act to conclusively deny them an opportunity to establish their dependency and their right to insurance benefits . . . ." *Id.* Second, the Court narrowed its focus to a comparison of those afterborn illegitimates who came within exceptions and thus qualified for benefits, and those afterborn illegitimates who fell outside the exceptions and were denied a chance to demonstrate dependency altogether. In finding the provision unconstitutional, the Court decided the potential for generating non-meritorious claims was equal for both groups; "hence to conclusively deny one subclass benefits presumptively available to the other denies the former the equal protection of the laws . . . ." *Id.* at 637, 94 S.Ct. at 2502.

The statutory scheme before this Court today is similar to the one involved in *Jimenez.* Because the father of the plaintiffs in the instant case was a federal employee, the Civil Service Retirement fund rather than the Social Security fund is involved, but this fact is not significant as far as the issues here are concerned. As in *Jimenez,* the government maintains that the overall purpose of the statutory provisions at issue is to channel financial support to children who were actually dependent on the worker involved and to weed out the undeserving claims.[1] In the service of these purposes, the statute divides potential recipients into a number of categories. All legitimate children enjoy a conclusive presumption of dependency. Since the only illegitimate children who qualify for benefits are those who "lived with the employee . . . in a regular parent-child relationship", illegitimates are divided into two classes. Those who are able to show cohabitation are thereafter presumed to be dependent and need not make an additional showing to that effect; those who do not show cohabi-

---

1. The Court of Claims analyzed these same statutory provisions in two opinions, *Gentry v. United States,* 546 F.2d 343 (1976), *motion for reconsideration denied,* 551 F.2d 852 (1977), and suggested that Congress' object might have been to channel benefits to all actual children of a given worker regardless of their state of dependency. 546 F.2d at 353; 551 F.2d at 854. This Court confines its analysis to the legislative purposes asserted by the government in the instant case. *See also Lucas, supra,* 427 U.S. at 502–503, 508, 96 S.Ct. 2755. The Court of Claims' ultimate result would not be different.

tation are conclusively barred from benefits and have no chance to address the dependency question directly.

Before *Jimenez* can be relied upon as decisive precedent, however, the Supreme Court's opinion in *Mathews v. Lucas, supra,* must be considered. *Lucas* upheld the constitutionality of a Social Security Act provision related to the one struck down in *Jimenez.*

The program dealt with in *Lucas* dispenses benefits to survivors of deceased workers rather than to offspring of living but disabled workers. Eligibility is governed by many of the same statutory definitions of "child" which the Court considered in *Jimenez*, but the definitional scheme differs in several crucial respects to suit the characteristics of a survivors' benefit program. All legitimate children occupy one category, as in *Jimenez*, and receive benefits without having to make an individualized showing of actual dependency. Illegitimate children are divided into a number of classes. Those applicants who make a showing that (a) they can inherit under the applicable state intestacy law, (b) their deceased parent had gone through a marriage ceremony with the other parent which, but for a nonobvious legal defect, would have been valid, (c) their parent had acknowledged his or actual parentage in writing, (d) their parent had been decreed by a court to be the parent, or (e) their parent had been ordered by a court to support the applicant because of parentage, are then declared eligible for benefits without having to make a further showing of actual economic dependency.

The critical difference between the requirements considered in *Jimenez* and *Lucas* was that all applicants for the benefits program with which *Lucas* was concerned still had a chance to show "by evidence satisfactory to the Secretary" that the deceased worker "was living with or *contributing to the support of*" the applicant at the time the worker died. Social Security Act, 42 U.S.C. § 416(h)(3)(C)(ii). [Emphasis added.] Thus the illegitimate children involved in *Lucas* were given a chance to show dependency, and challenged the statute only

after they were unable to make this showing. They were restricted to arguing before the Supreme Court that Congress' purpose in enacting the program of benefits in question was not to aid dependents of enrolled workers, but *all* children of enrolled workers, dependent or not. *Lucas, supra,* 427 U.S. at 508, 96 S.Ct. 2755. Plaintiffs contended further that, in any event, the statute violated equal protection principles by extending a "presumption" of dependency to all legitimates and to those illegitimates within the exceptions, while requiring that their subclass of illegitimates make a showing of actual dependency. At 508–509, 96 S.Ct. 2755. This amounted to a contention that since the Congressional authors had been over-inclusive in some respects for reasons of administrative convenience and ultimate economy, they should be compelled to be over-inclusive in all other respects for reasons of constitutional equity.

Finding plaintiffs were wrong in their assessment of legislative intent, the Court indicated that the purpose of the Social Security Act provisions was to route benefits only to dependent children. This determination meant that the statute was not at all under-inclusive, since all illegitimates had a chance to show their dependency and thus qualify for benefits, but that its presumptions made it over-inclusive. The Court then pointed out that the Act's use of presumptions was directed at avoiding "the burden and expense of specific case-by-case determination in the large number of cases where dependency is objectively probable," at 509, 96 S.Ct. at 2758, and concluded that these presumptions were "reasonably related to the likelihood of dependency at death." *Id.*

As for the contention that Congress could not be over-generous in some categories unless it was over-generous in all, the Court noted that its standard of review for legislative distinctions based on illegitimacy was "less than strictest scrutiny," at 510, 96 S.Ct. 2755, and that the statute before it did not "broadly discriminate between legitimates and illegitimates without more, but·

[was] carefully tuned to alternative considerations." At 513, 96 S.Ct. at 2766. In particular, a presumption of dependency was extended to some illegitimates, and was "withheld only in the absence of any significant indication of the likelihood of actual dependency." *Id.*

This approving language was confined to the statute before it in which Congress had granted presumptions to some children and required of others proof that they came within the law's purpose. The Court sharply distinguished situations, similar to the instant case, in which an opportunity to show proof was denied altogether:

> To begin with, we note that the statutory scheme is significantly different from the provisions confronted in cases in which the Court has invalidated legislative discriminations among children on the basis of legitimacy. . . . Under all but one of the statutes, not only was the legitimate child automatically entitled to benefits, but an illegitimate child was denied benefits solely and finally on the basis of illegitimacy, and regardless of any demonstration of dependency or other legitimate factor. . . . [The] conclusiveness in denying benefits to some classes of afterborn illegitimate children, which belied the asserted legislative reliance on dependency in *Jimenez*, is absent here, for, as we have noted, any otherwise eligible child may qualify for survivor benefits by showing contribution to support, or cohabitation, at the time of death. At 511–512, 96 S.Ct. at 2765.

■ *Lucas* represents a useful refinement of the *Jimenez* opinion, which did not indicate whether the core of the constitutional infirmity to the statute involved lay in its grant of benefits to some children without a required showing of dependence, its denial of benefits to others without the opportunity of a showing, or both in equal measure. *Lucas* established that the decisive constitutional requirement in such cases is a fair opportunity for plaintiffs to demonstrate, before being rejected conclusively for benefits, that they are in the class of people the statute is designed to serve.

It is true that the Supreme Court has sustained, in other areas of social welfare legislation, classifications which create irrebuttable presumptions of non-eligibility. *Mathews v. De Castro,* 429 U.S. 181, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976), involved a provision of the Social Security Act which grants benefits to a married woman whose husband retires or becomes disabled if she has a minor or other dependent child in her care, but does not grant benefits to a divorced woman in the same position. As the Court observed, the overall purpose of the Social Security system is to provide workers and their dependents with basic protection against certain hardships. At 186, 97 S.Ct. 431. Plaintiff argued, in effect, that the statutory provision at issue was fatally underinclusive in imposing an irrebuttable presumption that divorced women did not come within this purpose.

■ The Court decided that the legislative classification at issue was to be evaluated according to the traditional test of whether it was rationally related to the statute's overall objective. At 185, 97 S.Ct. 431. Congress, the Court concluded, "could have rationally assumed that divorced husbands and wives depend less on each other for financial and other support than do couples who stay married." At 188, 97 S.Ct. at 436. *Accord Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975).

The reason that principles like the ones applied in *De Castro* are not applied when the federal courts evaluate legislative classifications based on illegitimacy is that the Supreme Court has directed that illegitimacy be treated differently. Unlike distinctions turning on race, distinctions premised on illegitimacy are not "suspect" and are not subject to "strict scrutiny." *Trimble v. Gordon,* 430 U.S. 762, 97 S.Ct. 1459, 52 L.Ed.2d 31 (1977). On the other hand, unlike divisions based on the fact of marriage as opposed to divorce, distinctions which turn on illegitimacy have inspired a special jurisprudence which sets them apart from other schemes of classification. The prospect of children being denied legal rights or

government assistance because of matters beyond their control appears to disturb members of the modern court.[2] They have chosen to review twelve cases on the issue since 1968 and have struck down distinctions based on birth in ten of them. *Trimble, supra* at 764, 97 S.Ct. 1459.

■■■ While the constitutionality of legislative classifications based on illegitimacy still turns, as with other classifications, on the "character of the discrimination" and its relationship to the overall purposes of a statute, *Lucas, supra,* 427 U.S. at 504, 96 S.Ct. 2755, this relationship must be more than merely "rational." When statutory classifications "approach sensitive and fundamental personal rights, this Court exercises a stricter scrutiny." *Trimble, supra,* 430 U.S. at 767, 97 S.Ct. at 1463, quoting *Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 172, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972).

In the instant case, while the relevant statute is challenged on equal protection grounds, the unequal protection involved has to do with the alleged withholding of due process from illegitimate children. *See Stanley v. Illinois,* 405 U.S. 645, 649, 658, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Carrington v. Rash,* 380 U.S. 89, 90, 96–97, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954).[3] Since illegitimate children are given an opportunity to show that they "lived with" the deceased worker, the issue is not whether "process" has been denied altogether, but whether the process provided is that which is "due" to illegitimate children in this situation. *See Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Goldberg v.*

*Kelly,* 397 U.S. 254, 263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

As a general matter, *Lucas* and *Jimenez* indicate that when a government program aiding dependents of workers is involved, illegitimate children must be given an opportunity to show dependency. "Assuming that the appellants are in fact dependent on the claimants, it would not serve the purpose of the Act to conclusively deny them an opportunity to establish their dependency . . . ." *Jimenez, supra,* 417 U.S. at 636, 94 S.Ct. at 2501; *see Stanley v. Illinois, supra,* 405 U.S. at 652–653, 92 S.Ct. 1208. *Lucas* held, in effect, that allowing illegitimate applicants a chance to show that the deceased worker "was living with or contributing to the support of" the applicant was commensurate with allowing them a chance to show "dependency", at least when such an opportunity was linked with other exceptions under which illegitimate children could qualify for benefits. The statute before us gives illegitimate applicants a chance to show that they "lived with the employee . . . in a regular parent-child relationship", and thus includes one of the two final qualifying factors present in *Lucas.*

By itself, a numerical count of the ways in which illegitimate children can qualify for benefits is a crude measure of constitutional adequacy at best, but it suggests something of the problem with the provision before us. *Lucas* upheld a statute under which illegitimate children may qualify to receive benefits if they meet any of seven different criteria. *Jimenez* struck down a statute under which afterborn illegitimates received benefits if they met any

2. The issue of discrimination against children of divorced women was not raised in *De Castro,* apparently because the statutory scheme provides direct benefits to such children despite the ineligibility of their mothers. The children, like the children of married couples, need only show they are dependent on the disabled or retired wage earner and either under 18 years old (or a full-time student under 22 years old) or under a disability. *De Castro, supra,* 429 U.S. at 183 & n. 4, 97 S.Ct. 431.

3. *Stanley, supra,* involved an irrebuttable presumption that unwed fathers—but not unwed mothers—were unfit to raise their own children. Held: "[A]s a matter of due process of law, Stanley was entitled to a hearing on his fitness as a parent before his children were taken from him and . . . by denying him a hearing and extending it to all other parents whose custody of their children is challenged, the State denied Stanley the equal protection of the laws guaranteed by the Fourteenth Amendment." 405 U.S. at 649, 92 S.Ct. at 1211.

of five criteria. We have before us a statute under which illegitimates can qualify under a single criterion only. We note also that if the father of the children here had been under the Social Security system rather than the Civil Service Retirement system, his illegitimate children would have qualified for benefits under three of the criteria considered in *Lucas* and *Jimenez.* The father of these children had been decreed by a court to be the parent (and in addition had acknowledged them), had been ordered by a court to support the children because he fathered them, and was contributing to the support of the children at the time he died.

■ A sophisticated means of using the number as well as the substance of potential qualifying factors in order to test constitutional adequacy is the concept of "fine tuning" first presented in *Lucas.* The Court there, upon examining the eligibility options open to illegitimates, concluded that "the statute does not broadly discriminate between legitimates and illegitimates without more, but is carefully tuned to alternative considerations." *Supra,* 427 U.S. at 513, 96 S.Ct. at 2766. Just six months ago in *Trimble, supra,* the Supreme Court considered a state statute which allowed illegitimates to inherit by intestate succession only through their mothers. The Court wrote,

> [T]he question of whether the statute "is carefully tuned to alternative considerations" is equally applicable here. We conclude that [the intestacy statute] does not meet this standard. . . . The facts of this case graphically illustrate the constitutional defect of [the statute]. Sherman Gordon was found to be the father of Deta Mona in a state court paternity action prior to his death. On the strength of that finding, he was ordered to contribute to the support of his child. That adjudication should be equally sufficient to establish Deta Mona's right to claim a child's share of Gordon's estate . . . .. 430 U.S. at 772, 97 S.Ct. at 1466.

■ In the instant case, as indicated, the deceased was found to be the father of the children in a paternity action in the District of Columbia and ordered to contribute to the support of his children. Notions of "fine tuning" suggest that these facts should have been included as "alternative considerations" in the Civil Service Retirement laws, just as they were in the Social Security laws—at least in a situation, such as this, in which there is a lack of other alternatives to the single "lived with" criterion.

The matter boils down to this: given that the overall purpose of the statute is to aid dependents of federal employees, and given that the "character of the discrimination" here revolves around use of a single criterion to determine the dependency of illegitimates, and given that the relationship between the discriminatory factor and the statutory purpose must survive an analysis of intermediate intensity, does imposition of this single criterion upon illegitimates deprive them of the equal protection of the laws? This Court decides that it does. In this day and age, cohabitation with one's parent does not correlate reliably with economic dependency upon one's parent, as any consideration of the number of divorces and separations involving the once-married will show. The law recognizes this poor correlation implicitly by *not* requiring a showing of cohabitation for legitimate children. Further, it is revealed by analysis of the alternative criteria contained in the statute considered in *Lucas.* An individual who has been decreed by a court to be a child's parent, or who has been ordered by a court, presumably without his blessing, to render child support, is unlikely to be living with the illegitimate child whom the court is attempting to help. The Social Security Act's definitional scheme for qualifying applicants for survivors' benefits thus covers children who would be excluded by a cohabitation criterion applied alone. In contrast, The Civil Service Retirement Act's definitional scheme strands these children, among whom are the children in this case.

■ Stated in the language of *Lucas* and *Trimble*, the statute before us discriminates between legitimates and illegitimates without the fine tuning such a sensitive distinction requires. The Court is persuaded that the character of the discrimination·effected by the statutory language does not bear a relationship to the statute's overall purpose which is even rational, given that the purpose is to aid all children who are dependents of federal employees enrolled in the Civil Service's program of benefits. Much less could the relationship in question withstand a more demanding level of scrutiny.

■ The Court, therefore, enjoins the Civil Service Commission from imposing the "lived with" eligibility requirement of 5 U.S.C. § 8341(a)(3)(A)(ii) upon illegitimate applicants. We direct the Commission to place plaintiff's children on its rolls for receipt of child survivor annuities, and to dispense to plaintiff's children a lump sum in the amount of annuity payments the children would have received if their application had been approved when it was originally filed on January 18, 1975.